Having reviewed the competent evidence of record and the positions of counsel, the Full Commission hereby affirms the Opinion and Order of the deputy commissioner as modified herein.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on 30 September 1999, which are incorporated herein by reference, and at the deputy commissioner's hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, and the parties are properly before the Commission.
2. All parties have been correctly designated, and there is no question as to misjoinder or non-joinder of parties.
3. No parties appeared in a representative capacity.
4. The plaintiff's average weekly wage is $1,083.39.
 ***********
Based upon all of the competent evidence adduced from the record, and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff began working as a driver and mover for defendant-employer in 1989. As a driver and mover, plaintiff would drive a moving truck to a private residence and either load or unload furniture or boxes, etc. Plaintiff's duties also included taking an inventory of what was loaded and transporting the load to the contracted destination.
2. The truck and trailer driven by plaintiff was owned by defendant-employer and defendant-employer arranged the "haul." Defendant-employer was an agent for several moving companies.
3. Plaintiff was required to have a commercial driver's license and to participate in a class for certification that was required by one of the defendant-employer's licensors, Allied Van Lines.
4. On or about 14 January 1998, plaintiff worked for defendant-employer as a driver and a mover and was paid a commission, which was a percentage of the "haul" charge. When not working as a driver and mover, plaintiff would work for defendant-employer at defendant-employer's facility. For this work he was paid $10.00 per hour.
5. In 1997, plaintiff was paid $3,537.60 for his work at defendant-employer's facility and received a W2, Wage and Tax Statement. Plaintiff received $52,798.80 in commissions as a driver and mover, and received a Form 1099.
6. When plaintiff first began working as a driver and mover for defendant-employer, defendant-employer withheld a certain amount from his commission to cover Workers' Compensation insurance premiums. According to plaintiff, $6.75 was taken out of every $100.00 commission.
7. On or about 31 December 1994, plaintiff entered into a document entitled "Independent Contractor Operating Agreement" with defendant-employer. The Agreement indicates plaintiff was to receive 42% of "haul" charges as his commission. Further, the Agreement indicates that plaintiff agreed to furnish evidence of workers' compensation insurance coverage, and if not furnished, that the defendant-employer would then enroll plaintiff in a workers' compensation insurance plan paid for by defendant-employer subject to reimbursement by plaintiff through deductions from his earnings.
8. On or about 28 May 1997, plaintiff initialed a change on paragraph 34 of the "Independent Contractor Operating Agreement" which added the phrase "or an occupational accident" to the paragraph. This allowed the defendant-employer to enroll plaintiff and other drivers and movers in an occupational accident insurance plan.
9. The addition of occupational accident insurance on 28 May 1997 was due to the fact that the drivers and movers wanted to have more "take home" money, and the plan costs considerably less than the workers' compensation insurance coverage previously provided.
10. The Agreement sets out specifically what plaintiff was to do, including obtaining approval from defendant prior to having the vehicle towed, repaired, or the tires replaced. Plaintiff was to haul only those shipments assigned by defendant. Plaintiff was required by defendant to protect all shipments against loss and damage, meet all required delivery dates, and proceed as scheduled and directed by defendant. Plaintiff was required to check in with defendant's dispatching office before 9:00 am and at such other times and as the dispatching office may direct.
11. Pursuant to the Agreement, plaintiff, and the other drivers, were required to prepare daily logs in accordance with Federal, State, and defendant's rules and regulations. Drivers were required to turn in their logs at least once every seven days. All fuel receipts were to be signed, properly completed and turned in on the date of purchase. All delivery documents were to be furnished to the defendant-employer's dispatching office properly signed and dated, at least once a week. Drivers were subject to verbal warnings for failure to handle the documents as prescribed.
12. In March 1995, defendant provided plaintiff with a twenty-six page Coastal Moving Company "Policy and Procedure Manual." The manual contained directives relating to the drug and alcohol policy, standards for drivers' qualifications, passengers in the vehicles, the drivers' logs, accidents and accident reporting, vehicle inspections, time off, holidays and vacations, tobacco use, stretch wrapping, and non-temporary storage.
13. According to the manual, drivers were subject to random drug and alcohol testing, and refusal or failure to submit to a test could result in dismissal from the company. The transportation of any passenger not authorized in writing would result in a fifteen-day suspension of the driver and disqualification for any subsequent offense. Drivers who violate the D.O.T. hours of service rules could be suspended and may be required to attend Allied Van Foreman School. Drivers were subject to warnings, suspensions, or disqualification for preventable accidents. Drivers were required to report an accident as soon as possible. Drivers were required to conduct daily pre-trip inspections.
14. Chapter 7 of the manual is entitled "Policy on Time Off, Holidays and Vacations." In the first section of that chapter, employees are divided into four categories, including "lease drivers." According to the manual, drivers earn 3.3 hours of vacation time a month. Drivers may request vacation time of their supervisor provided that the driver's absence does not jeopardize the scheduled operations of the company. Vacations are not permitted between Memorial Day and Labor Day, or the last two weeks of both November and December.
15. In the manual, drivers were given specific instructions on packing, use of containers, and inventory of non-temporary storage items. This included how to seal the cartons, how to label them, which tags to use, and how to place the cartons.
16. On 14 January 1998, while loading a washing machine in Stafford, Virginia, plaintiff injured his back.
17. Plaintiff received medical treatment from Dr. Robert Abraham in Jacksonville, North Carolina, and was released to return to work with restrictions in June 1998.
18. Plaintiff's loading of the washing machine on the truck was an integral part of his task of transporting goods in interstate commerce. Accordingly, while plaintiff was loading the washing machine, he did so under the Workers' Compensation Act as an employee of the defendant.
19. As evidenced in the agreement, the manual, and the course and scope of the dealings between the parties, defendant-employer maintained sufficient control over plaintiff and the task which he was performing such that an employment relationship was established.
20. Plaintiff received benefits from the occupational accident plan, and those benefits were stopped on 22 July 1998 because plaintiff filed a Workers' Compensation claim.
21. The day after the injury, plaintiff presented to Onslow Doctors Care. An x-ray of plaintiff's lumbar spine was taken and plaintiff was referred to Dr. Noel B. Rogers at Jacksonville Orthopaedic Clinic.
22. Dr. Rogers treated plaintiff conservatively, and referred plaintiff to Onslow Memorial Hospital for physical therapy. Dr. Rogers opined that plaintiff would be unable to return to his employment as a driver and mover. He also referred plaintiff to Dr. Robert Abraham.
23. Dr. Abraham noted that plaintiff had pain in his back and lower extremities, right greater than left. Plaintiff suffered from the pain all of the time, and it varied in severity. Plaintiff had an increase in sharp local pain with sitting and driving. An MRI was done of plaintiff's lumbar spine and revealed moderate degenerative joint disease at L5-S1, a minimal bulge at L5-S1 and minimal left lateral disk bulge. Plaintiff was diagnosed as having right lumbar radiculopathy. Plaintiff was referred to the Physical Therapy Clinic for physical therapy.
24. In June 1998, plaintiff was released to return to work by Dr. Abraham with the restrictions that he was unable to drive more than 300 miles a day and no lifting greater than thirty pounds. Plaintiff attempted to return to work, but the pain increased and in July 1998, Dr. Abraham took plaintiff out of work because of his back injury. Plaintiff has been taking pain medications for his back pain.
25. In May 1998, defendant ordered an independent medical evaluation to be performed by Dr. Donald D. Getz of Coastal Orthopaedics. In his evaluation, Dr. Getz stated that plaintiff had chronic back strain, that he did not appear to be magnifying his symptoms, and that he would have to work on light duty. He noted that plaintiff had objective findings of mild muscle spasms in the lumbosacral area. Dr. Getz diagnosed plaintiff with chronic back strain and stated that his back injury was directly related to the event that occurred on 14 January 1998.
26. Plaintiff again attempted to return to work from November 1998 to April 1999 at McCall's Seafood Barbeque and at Duck's. Plaintiff was unable to continue working in these positions because of his back injury.
27. As a result of the work-related compensable injury to his back, plaintiff has been unable to return to work at the wages equal to what he was earning at the time his injury occurred. Plaintiff unsuccessfully attempted to return to work at McCall's and Duck's.
28. Dr. Abraham testified in his deposition on 12 December 2000 that plaintiff should continue to his present level of activity of limited driving and a lifting restriction of thirty to forty pounds.
29. Plaintiff is currently employed part time with Sears as a sales associate. The position requires constant standing. Plaintiff is also currently enrolled in Coastal Carolina Community College taking courses to assist him in finding a position with the earning capacity of his employment with Coastal Moving and Storage.
30. The medical treatment which plaintiff has received has tended to effect a cure, give relief, or lessen the period of disability.
 ***********
The foregoing findings of fact engender the following additional:
 CONCLUSIONS OF LAW
1. On 14 January 1998, plaintiff was an employee of defendant-employer as he carried out his duties pursuant to the agreement of transporting and loading goods, and as such, was subject to the provisions of the Workers' Compensation Act. N.C.G.S. § 97-2(2); Brown v. Truck Lines,227 N.C. 299, 42 S.E.2d 71 (1947).
2. Defendant-employer's attempt to evade its responsibility under the Act by having plaintiff enter into the occupational accident insurance plan is an unsuccessful attempt to contract away its workers' compensation liability. N.C.G.S. § 97-6; Hoffman v. Truck Lines, 306 N.C. 502,293 S.E.2d 807 (1982).
3. On 14 January 1998, defendant-employer exercised sufficient control over plaintiff's duties and equipment such that an employment relationship was established. Further, the nature and goal of plaintiff's actions at the time of his injury were reasonably related to his employment. N.C.G.S. § 97-2(2); Hoffman v. Truck Lines, Inc.,306 N.C. 502, 293 S.E.2d 807 (1982); Brown v. Truck Lines, 227 N.C. 299,42 S.E.2d 71 (1947); Smith v. Central Transport, 51 N.C. App. 316,276 S.E.2d 751 (1981).
4. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer on 14 January 1998. N.C.G.S. § 97-2(6).
5. As of 14 January 1998, as a direct and proximate result of plaintiff's compensable injuries, plaintiff has been disabled as defined by N.C.G.S. § 97-2(9). Plaintiff has been unable to earn wages equal to those he was earning at the time of his compensable injury by accident. Plaintiff has been totally disabled, with exceptions for the periods of 16 June 1998 through 22 July 1998, and 28 November 1998 through 8 April 1999 and June 13, 2000 through present when plaintiff was able to earn some wages, though not equal to the wages he was receiving at the time of his compensable injury by accident.
6. Plaintiff's two attempts to work at McCall's and Duck's were unsuccessful trial returns to work. N.C.G.S. § 97-32.1.
7. Plaintiff's average weekly wage is $1,083.39. Plaintiff is entitled to temporary total disability from 14 January 1998 through 15 June 1998, and from 23 July 1998 through 27 November 1998, and from 9 April 1999 through 12 June 2000. N.C.G.S. § 97-29.
8. Plaintiff is entitled to temporary partial disability benefits from 16 June 16 1998 to 22 July 1998, 28 November 1998 to 8 April 1999, and from 13 June 2000 and continuing at the rate of two-thirds of the difference between his pre-injury average weekly wage ($1,083.39) and his post-injury earning capacity, subject to the limitations of N.C.G.S. § 97-30, or order of the Commission.
9. To the extent the same is reasonably designed to effect a cure, give relief, or lessen the period of disability, defendant-employer shall pay all medical expenses incurred by plaintiff as a result of his compensable injury, subject to the limitations of N.C.G.S. § 97-25.1. N.C.G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Plaintiff is entitled to temporary total disability in the amount of $532.00 per week from 14 January 1998 through 15 June 1998, and from 23 July 1998 through 27 November 1998, and from 9 April 1999 through 12 June 2000. Said amount shall be paid in a lump sum subject to an attorney's fee approved in paragraph 4.
2. Plaintiff is entitled to temporary partial disability benefits from 16 June 16 1998 to 22 July 1998, 28 November 1998 to 8 April 1999, and from 13 June 2000 and continuing at the rate of two-thirds of the difference between his pre-injury average weekly wage ($1,083.39) and his post-injury earning capacity, subject to the limitations of N.C.G.S. § 97-30, or order of the Commission. Benefits that have accrued shall be paid in a lump sum and the accrued and unaccrued benefits are subject to the attorney fees approved in paragraph 4.
3. Defendants shall pay all medical expenses resulting from plaintiff's compensable injury by accident on 14 January 1998, subject to the limitations of N.C.G.S. § 97-25.1.
4. A reasonable attorney fee of twenty-five percent (25%) of compensation due plaintiff is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent (25%) of lump sum due plaintiff, shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, plaintiff's counsel is entitled to receive every fourth check.
4. Defendants shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER